**376 A.2d 1041.**

NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY
*vs.* PUBLIC UTILITIES COMMISSION *et al.*

JULY 12, 1977.

PRESENT: Bevilacqua, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

572

DORIS, J. This is a public utility rate case. It is before us on a motion by the New England Telephone and Telegraph Company (hereinafter "the company") for further consideration of a supplementary report and order of the Public Utilities Comission (hereinafter "the commission"), pursuant to our opinion in *New England Tel. & Tel. Co.* v. *Public Util. Comm'n,* 116 R.I. 356, 358 A.2d 1 (1976).

The early history of this case may be found in the above opinion. Briefly, in August 1974, the company filed a tariff with the commission seeking to increase its revenues by approximately $19,500,000. The commission eventually allowed an increase of only $7,245,000. Thereafter the company filed a petition for a writ of certiorari in this court to review the commission's order pursuant to G.L. 1956 (1969 Reenactment) §39-5-1, as amended by P. L. 1969, ch. 240, §8 and P.L. 1973, ch. 199, §4. We determined that the commission's order was erroneous in three respects and remanded the case to the commission with the following instruction:

> "[R]eview the evidence and testimony in the present record as supplemented by such further testimony as may be offered by the parties or by the commission's own direction. On the basis of this record so supplemented, the commission is directed to make further findings and orders in harmony with this opinion. The commission's hearing on remand is to be limited to those portions of the original report and order specifically found by this court to be lacking in evidentiary support, that is, the rate of return, the purchases from Western Electric and the working capital allowance. Any party dissatisfied with said decision may, by motion filed in this court within 20 days following the commission's action, bring the matter before us for further consideration." *Id.* at 394-95, 358 A.2d at 23.

The commission subsequently held seven days of hearings. On December 10, 1976, it issued a supplementary order and report which permitted the company to collect $742,000 of additional revenue. On December 17, 1976, the company moved for further consideration of that supplementary order on the following grounds: first, that the commission failed to consider the company's post test year experience in certain instances, and as a result did not make a suitable erosion adjustment or rate of return; second, that the commission misconceived the nature of

the gross receipts tax and consequently failed to make an adequate working capital allowance; third, that the commission adopted a return on equity that was based on faulty and discredited testimony.

It is important to keep in mind the principles of appellate review in a public utility rate case. However, there is no need at this point to discuss them at great length because they are well known and have been summarized in several recent opinions of this court. *New England Tel. & Tel. Co.* v. *Public Util. Comm'n,* 116 R.I. at 362-63, 358 A.2d at 7; *Rhode Island Consumers' Council* v. *Smith,* 111 R.I. 271, 277, 302 A.2d 757, 762-63 (1973). It is enough here to note that we do not sit as factfinders; our role is simply to determine if the commission's decision was lawful and reasonable and substantially supported by legal evidence. Bearing this limited role in mind, we now consider individually each of the company's claims.

I. Use of Post Test Year Experience.

The company claims that the commission erroneously used stale information to reach its decision at the remand proceeding, in that it used data from the original hearing (hereinafter referred to as "the 1974 data") instead of the company's most recent experience (hereinafter "the 1976 data").[1] The argument is aimed in particular at the commission's use of the 1974 rate base to determine the erosion adjustment and the allowed rate of return.

Our discussion of the company's claim will be structured as follows: first, we will set out the commission's actions with respect to erosion and the rate of return, and the company's objections thereto; second, we will discuss the general principles involved in the use of post test year

---

[1] The test year in the original proceeding was the year ending June 30, 1974; at the remand, the company proposed a test year ending March 31, 1976.

data in a remand proceeding; and third, we will consider the commission's decision in light of these principles.

A. The commission's decision. In its original order, the commission added an erosion adjustment[2] of 0.3 percent

[2]Erosion of a utility's rate of return due to attrition has been frequently discussed in recent years. *E.g., Rhode Island Consumers' Council v. Smith,* 111 R.I. 271, 302 A.2d 757 (1973); *New England Tel. & Tel. Co. v. Department of Pub. Util.,* 331 Mass. 604, 622, 121 N.E.2d 896, 906 (1954). Although various definitions have been given, most are similar to that adopted in *New England Tel. & Tel. Co. v. State,* 113 N.H. 92, 96-97, 302 A.2d 814, 817-18 (1973):

"'Of course we know that under actual conditions, a utility's operations in the future will usually be at a different level from the test year. Usually a utility's service requirements are growing, and its investment, revenues, and expenses can generally be expected to increase as the service grows. But as long as revenues and costs remain in generally the same relative position as the test year, future costs will be covered.'"

"However, if unprecedented demands for goods and services at increasing costs upset the balance between revenues, investments and expenses, the assumption that future results will approximate those of the past is not realized in fact. The result is attrition. [Citations omitted.]

"Attrition [is] '[A]n erosion in earning power of a revenue-producing investment. This erosion is a complex phenomenon, the result of operating expenses or plant investment, or both, increasing more rapidly than revenues. If attrition occurs, the result would be that the rate of return realized in the future would be below that which rates were designed to produce.' This effect is apt to occur in a period of comparatively high construction costs when "new plant is being added which . . . is relatively expensive per telephone station. As the high cost plant comes into service, it tends to increase the applicable rate base at a more rapid pace than the resultant earnings, and the rate of return decreases accordingly."

To present such a diminution in the actual rate of return earned by a public utility, its level of allowed earnings will often be augmented by means of an erosion adjustment. This usually takes the form of an increase in the allowed rate of return, an increase in the rate base, or some combination of the two. *See State v. New Jersey Bell Tel. Co.,* 30 N.J. 16, 35-36, 152 A.2d 35, 46 (1959).

For convenience, we will use the term "erosion" interchangeably with the term "attrition".

to the company's otherwise allowable rate of return. On
appeal, we found that adjustment to be without eviden-
tiary support and directed the commission to make a suit-
able erosion adjustment based on the evidence before it.
*New England Tel. & Tel. Co.* v. *Public Util. Comm'n*, 116
R.I. at 371, 358 A.2d at 12. On remand, the commission
found the most suitable means of establishing an erosion
adjustment to be that originally proposed by the company
in the first proceeding; namely, to add to the otherwise
allowable rate base an amount equal to the company's
average annual increase in investment. Accordingly, the
commission calculated the increase in investment which
occurred subsequent to the 1974 test year, from June 30,
1974 to March 31, 1976. It then took the average 12
month increase over this period and added that amount
to the 1974 rate base.[3]

It is this use of the 1974 rate base to which the company
objects. The company argues that to achieve a meaning-
ful erosion adjustment, the average increase in investment
must be added to the *actual* rate base at the time of the
remand. The company thus wants the rate base "up-
dated".

Next, we turn to the commission's use of post test year
data with respect to the rate of return. In both the original
decision and the decision on remand, the commission fol-
lowed the traditional path of determining the company's
capital structure, then determining the cost of debt and
equity, and finally combining these figures to obtain the
allowed rate of return. This rate of return was then multi-
plied by the rate base to determine the allowed earnings.

In its original decision the commission disallowed cer-
tain proposed construction costs and concluded that since
the company's need to attract capital was thereby dimin-
ished, its required rate of return on equity could also be

---

[3]The actual calculation is discussed later in this opinion.

reduced. On appeal we found this portion of the decision to be without evidentiary support and directed the commission on remand to reconsider the rate of return. On remand the commission heard additional evidence on the issue, including post test year data, and made a completely new determination of the allowed return. In so doing, it used the company's 1975 capital structure, which differed from the 1974 capital structure. It then multiplied the new rate of return by the 1974 rate base, to determine the allowed earnings.

The company again objects to the use of a 1974 rate base. It claims that when it is used in conjunction with a post test year capital structure, two undesirable consequences occur; one, a distorted view of the company's financial situation is created, and two, the company's right to use accelerated depreciation for purposes of federal income taxes is jeopardized.[4]

B. General principles regarding use of post test year data. It is our task to decide whether the commission's failure to consider the company's 1976 rate base in the instances described above was unreasonable or otherwise

---

[4]The 1974 capital structure found by the commission in the original proceedings was:

| | |
|---|---|
| Debt | 46.6% |
| Common Equity | 48.4% |
| Deferred federal income taxes | 5.0% |

The 1975 capital structure used on remand was:

| | |
|---|---|
| Debt | 44.40% |
| Common Equity | 48.02% |
| Deferred federal income taxes | 7.58% |

Since deferred taxes are carried as cost-free capital, the increase in the proportion of capital allocated to taxes results in a lower required return for the company.

The issue with respect to the right to use accelerated depreciation arises from the fact that federal regulations prevent accelerated depreciation if the amount of deferred taxes treated as cost-free capital for ratemaking purposes exceeds the amount of deferred taxes used in determining cost of service for the same period. See Treas. Reg. §1.167 (*1*)-1 (1974).

not in accord with the law of this state. The rules of law are not in dispute. The commission must make rates for the future. *Rhode Island Consumers' Council* v. *Smith,* 113 R.I. 232, 319 A.2d 643 (1974). In so doing, it cannot shut its eyes to the company's actual operating results, nor can it rely on prophecy when the company's real experience is available. "[E]laborate calculations which are at war with realities are of no avail." *West Ohio Gas Co.* v. *Public Util. Comm'n,* 294 U.S. 79, 82, 55 S.St. 324, 325, 79 L.Ed. 773, 776 (1935). The question before us in this case is to what extent the above principles obligate the commission to take into account post test year data in a remand proceeding.

Perhaps because this issue has only recently grown to be a significant problem, there are few relevant cases, and none that we regard as controlling. For example, the company relies on *Letourneau* v. *Citizens Util. Co.,* 128 Vt. 129, 259 A.2d 21 (1969), for the proposition that the commission *must* consider updated information on remand. However, in that case it was only decided that where a remand hearing would be held five years after the initial tariff filing, the commission did not abuse its discretion in considering updated information on remand. The case of *Chenango & Unadilla Tel. Corp.* v. *Public Serv. Comm'n,* 45 App. Div. 2d 409, 357 N.Y.S.2d 937 (1974) presents a factual situation which is widely divergent from the one before us. The thrust of the holding in that case is that if a commission takes into consideration post test year revenues to set rates, it must also take into account other post test year changes in a utility's position. A recent Massachusetts decision directed a regulatory agency to consider the most recent available data on remand of a rate case, but that direction was explicitly linked to a finding of *confiscation. New England Tel. & Tel. Co.* v. *Department of Pub. Util.,* 371 Mass. 67, 354 N.E.2d

860, 866 (1976). No finding of confiscation was made by us prior to the remand in this case. The company also refers to many cases holding that rates are made for the future and cannot be based on stale information. But the extent to which those cases impose an obligation to hear post test year information is precisely the question before us.

Nor can we find any answers in cases cited by the commission. It places primary reliance on *Mountain States Tel. & Tel. Co.* v. *Public Util. Comm'n*, 180 Colo. 74, 502 P.2d 945 (1972). There, the company's subsequent experience was not considered on remand. However, that remand was much more clearly limited in scope than the proceeding in this case.

In our opinion, in deciding the extent to which the commission must consider post test year results we must strike a balance between competing interests. On the one hand, there is the importance of prospective rates. There is no doubt that use of recent information will insure a more accurate picture of the company's needs than the continued use of old data.

On the other hand, we think that a remand is not the same as an original rate hearing. It is a proceeding to correct specific errors in a prior proceeding. If the commission must consider all new data on remand, then the remand becomes in effect a new rate case. The statutory method of setting rates is bypassed as a result, and the prospect of a never ending, continually updated rate case looms. Such a result seems to us clearly wrong.

Therefore, in deciding the extent of the commission's obligation to consider the most recent data available to it on remand, we must take into consideration and give appropriate weight to the character of the remand proceeding. An appropriate balance would have been struck between these competing interests, in our opinion, if the

commission had used post test year data in the remand only with respect to the required reconsideration of the erosion adjustment. With respect to the other issues heard at the remand proceeding in this case, the commission should have based its decision on data which related back to the time period used in the original hearing.

This standard is described in further detail below, but we wish to note at the outset that whether it is reasonable to consider post test year data may depend on the circumstances involved. However, in the absence of special circumstances, the commission should act in accord with the standards contained herein.

We feel that treating the erosion adjustment differently from other aspects of the commission's decision is a reasonable procedure for several reasons. First, it seems to us to comport with common sense. A remand should not be an open ended affair, but should be an attempt by the commission to reach the result it would have reached had no mistakes been made. Accordingly, it is appropriate that the commission in general limit itself to considering data from the original time period.

Second, an erosion adjustment is truly distinguishable from the other parts of the commission's decision. It, much more than the remainder of the commission's decision, is intended to be a forecast of future economic events. After the commission computes the test year rate base, revenues, expenses, and adjustments thereto for *known* future changes, and all the other factors which go into determining the allowed rate of return, the commission tries, in effect, to estimate how this allowed rate of return will be affected by future inflation. It then makes what it hopes will be an adequate erosion adjustment. Accordingly, if this forecast is challenged on appeal and the commission is instructed to correct it on remand, it seems appropriate and reasonable for the commission to

582

compare its forecast with the company's actual subsequent results. It seems unreasonable for the commission on a remand in 1976 to attempt to "predict" what effect inflation will have in 1975 and 1976, based only on 1974 data, when the actual facts are known.

In short, calculations which were originally intended to be statements of current economic fact (such as test year rate base, expenses, etc.) should be recalculated on the basis of information available at the time of the original proceeding. Calculations which were intended as forecasts (such as the erosion adjustment) should be compared to the latest available figures to see if they were correct or not.[5]

Third, to the extent that failure to use current figures harms the company, that harm is caused by inflation. Since the erosion adjustment is specifically intended to compensate for inflation, *New England Tel. & Tel. Co.* v. *Department of Pub. Util.*, Mass., 354 N.E.2d at 865, it makes sense to use post test year results with respect to that adjustment.

Fourth, it is supported by our prior cases, at least inso-

---

[5]There is no doubt that the erosion adjustment is not *totally* distinguishable from other features of a rate decision solely on the ground that it is a forecast. All facets of the commission's decision are forecasts, in the sense that test year figures are accepted only after they are adjusted to compensate for known future changes, so as to produce a more accurate representation of the future needs of the company. Despite this, there is still a significant difference in the degree to which an erosion adjustment is a forecast and the degree to which other parts of the decision are. Furthermore, an erosion adjustment is a much more general prediction than other individual adjustments. It serves as a kind of summary of all the effects of inflation on the company's return, because it takes into account any offsetting savings which counteract inflationary effects. *See e.g., Re Southwestern Bell Tel. Co.*, 34 P.U.R.3d 257 (Kan. Corp. Comm'n 1960). *See generally* Nichols & Welch, *Ruling Principles of Utiltiy Regulation* at 55 et seq. (Supp. A 1964). It is these differences which we feel support a separate mode of treatment on remand.

far as we have previously ordered the commission to look at post test year results in determining the accuracy of an erosion adjustment. We said in *Rhode Island Consumers' Council* v. *Smith*, 111 R.I. at 298, 302 A.2d at 773.

> "Inasmuch as the commission must in any event reconsider its decision, it can as part of that reconsideration compare the company's actual rate of return since that decision with its earlier prognostications. It will then be in a position to make suitable adjustments which can reflect whatever erosive trends may be disclosed."

Fifth, this rule has the salutary effect of providing no updating at all in a totally noninflationary economy. This, we think, is proper. The need for updating springs primarily from inflation. In a noninflationary economy, the company's remedy of filing a new tariff request would provide adequate protection against increased revenue requirements.

Sixth, this rule promotes procedural simplicity. There is no need for the commission on remand to revise all of its former determinations. Only the erosion adjustment requires resort to later data.[6]

---

[6]We are aware that this rule does not completely eliminate the need for the commission to look at all of the company's latest operating results. In order to update the erosion allowance, the commission must look at the latest actual rate of return. This, in turn, means that the commission must look at the latest actual earnings and rate base. In addition, the commission must ascertain to what extent the rate of return has decreased due to inflation, and to what extent it has decreased due to other factors. However, these calculations are still more easily performed than those required to update all the figures for all purposes. That this is true is borne out by the commission's own conclusions in its supplementary order. Although it considered and ultimately accepted the company's estimate of its current rate base and rate of return in order to make an erosion adjustment, it stated: "We did not * * * have to concern ourself with the usual, time-consuming, line-by-line analysis of the Company's operations, which must be done with a new filing." *See New England Tel. & Tel .Co.* v. *State*, 113 N.H. 92, 302 A.2d 814 (1973) (consideration of attrition on remand need not entail full fledged rate hearing).

Finally, we think that this course is preferable to other options. As we see it, the commission has only three other choices. It can consider no updated information at all, it can consider *only* updated information, or it can consider updated information only with respect to those isues which are to be redetermined on remand.

The problem with the first choice is that there would then be an inadequate allowance for inflation, even though the issue was before the commission and the commission was perfectly capable of making an appropriate adjustment. This would be inconsistent with *West Ohio Gas Co.*

The problem with the second option, totally updating all information, is that it would fundamentally alter the rate hearing process. A remand proceeding would bear no relation to the original proceeding; it would in effect be an entirely new rate hearing, based on entirely different information. The anomalous result of a complete update on remand would be that no error in the original proceeding, no matter how small, could be corrected on remand; the error and remand would trigger a new rate case instead. If a new rate case is to be heard, it should be initiated in the manner provided by statute, not on the coattails of an order of this court.

The third alternative is to consider the company's most recent experience only with respect to those portions of the original decision which were determined on appeal to be erroneous. This apparently is the position the commission took. The commission relied on post test year data in redetermining the rate of return and erosion adjustment, but refused to update the rate base to which these results were applied.

We agree with the company that this results in a distorted view of the company's operations. It is crucial to *correlate* each piece of financial data with every other

piece from the same time period in order to obtain an accurate picture of the company's position.

For example, consider what would happen if, on appeal, this court determined that the commission was incorrect only insofar as it had failed to properly determine certain revenues. On remand, if the commission were to look at recent experience only regarding issues open on remand, the latest *revenue* figures would be used but, since by hypothesis *expense* figures had been properly determined in the original decision, it would continue to use the original expense data. Clearly this would be a distortion.

Nor can this problem be solved simply by updating expenses also. That would simply move the problem one step down the line. That is, if both revenues and expenses were updated, earnings would not be distorted, but when that current earnings figure was used with the old rate base to determine the company's rate of return, the rate of return would be distorted. This kind of mismatch did in fact occur in this case. The commission used a 1974 rate base and a 1975 capital structure. The resulting earnings requirement can hardly be said to relate to 1974 or 1975. Therefore, considering post test year figures only with regard to issues open on remand is in general an inferior procedure to the one we have chosen.

For all of the foregoing reasons, we think that in the absence of special circumstances the commission's obligation to make rates for the future and consider current data compels the following procedure on a remand: where an erosion allowance has been determined to be erroneous and must be corrected on remand, the commission should compare the original erosion allowance to the actual subsequent experience of the company and correct the allowance accordingly; however, the remainder of the commission's decision on remand should in general relate back to the figures used in the original hearing. While the rule

which we here announce requires updating in the event reconsideration of an erosion allowance is at issue, nothing we say herein should be construed as indicating that there are no other situations where updating may be required.

We realize that this is at best an imperfect solution. There is, after all, no exact way of isolating the effects of inflation on the company's operations. However, we do not write on a clean slate. So long as the rate setting process involves the use of an historical test year and a separate erosion adustment for inflation, this dichotomy will exist. It seems to us that other methods might be more desirable. *See e.g.*, Note, *The Use of the Future Test Year in Utility Rate-Making*, 52 B.U.L.Rev. 791 (1972). But it is not up to us to determine which method the commission should use to determine the rate base or to account for inflation so long as the result is just and reasonable. *Rhode Island Consumers' Council* v. *Smith*, 111 R.I. at 280, 302 A.2d at 764.

We repeat that what is a reasonable use of post test year data may vary from case to case. If, for example, a remand hearing were held an extraordinarily long time after the original hearing, the commission might reasonably decide that it was procedurally simpler to consider a new test year on remand. *See Letourneau* v. *Citizens Util. Co.*, 128 Vt. 129, 259 A.2d 21 (1969) (within discretion of commission to consider new test year where remand delayed five years). But the commission must act in accord with the principles set out above.

C. Application of principles to commission's decision. The commission's decision on remand with respect to erosion was, in part, as follows:

> "The Company has presented evidence that demonstrates that the Company has, from February 1970 through the present, continually failed to earn its authorized return. This fact was substantially unre-

butted. Consequently, we are constrained, in this case only, to provide a suitable attrition allowance.

"How is this allowance to be determined? The Company has suggested that 'the simplest and surest way of making some compensation for erosion' is, in essence, to add to rate base a figure which represents the projected increase in net investment over the 12-month period following the effective date of new rates. The figure suggested at our prior proceeding was $12.8 million.

"The Commission concludes that this method has validity in this case. Consequently, the Commission will add to the Company's rate base $13,290,000. This amount represents the Company's annual increase in investment based on its 21-month experience beyond the test period."

We are compelled to note that these findings are rather sparse. The commission concludes that it is appropriate to add the entire annual increase in investment to the rate base to adjust for erosion, but does not direct our attention to any evidence which supports that position. Taken by itself it seems to us that increase in investment is hardly an adequate measure of erosion. If, through technological improvements, growth in services provided, increase in productivity of labor or any of a number of other factors the company's revenues increase or expenses decrease, any growth in investment may be more than offset and rate of return may not decline. See State v. New Jersey Bell Tel. Co., 30 N.J. 16, 152 A.2d 35 (1959); Re Southwestern Bell Tel. Co., 34 P.U.R.3d 257 (Kan. Corp. Comm'n 1960). Average increase in investment is a valid measure of erosion of earnings only if there is evidence in the record which supports such a relationship. 1 Priest, Principles of Public Utility Regulation at 204 (1969). The commission has not explicitly directed our attention to any such evidence.

Likewise, failure to earn the authorized rate of return is not necessarily caused solely by attrition. It could be

due to many factors. An authorized rate of return is not a guarantee of that return; an erosion adjustment should not be based on a mere failure to achieve such earnings.

It is not our function, when reviewing a decision of the commission, to search the record for evidence in support of that decision. *United Transit Co.* v. *Nunes,* 99 R.I. 501, 209 A.2d 215 (1965). However, we will assume, keeping in mind that the commission need not set out specific factual bases for its decision where such bases may reasonably be implied from its language or actions, *New England Tel. & Tel. Co.* v. *Public Util. Comm'n,* 116 R.I. at 363, 358 A.2d at 7, that in approving the company's method of computing the erosion adjustment, the commission adopted the supporting testimony of Mr. John O'Neill, the company's general accounting manager. This assumption is supported by the commission's statement in its supplementary order that, with respect to the company's evidence of failure to earn its authorized return, "This fact was substantially unrebutted."

Mr. O'Neill testified that due to inflation the rate base had increased, and that there was no compensating increase in earnings. In fact, he testified that the company was experiencing a negative earnings growth. He presented the following estimates of the company's actual rate of return:[7]

---

[7]The information in this chart, which was submitted to us by Mr. O'Neill in support of the company's motion for a stay, was actually presented to the commission in the form of a graph. The chart and the graph convey the same data.

| DOCKET 1092 REMAND | | DOCKET 1170 | |
| --- | --- | --- | --- |
| Effective Aug. 13, 1973 | | Effective July 21, 1975 | |
| Rate of Return Allowed 8.38% | | Rate of Return Allowed 8.72% | |
| **1974** | **1975** | **1975** | **1976** |
| July 7.01% | Jan. 6.77% | July 6.26% | Jan. 6.39% |
| Aug. 6.94 | Feb. 6.62 | Aug. 6.27 | Feb. 6.47 |
| Sept. 6.87 | Mar. 6.56 | Sept. 6.35 | Mar. 6.48 |
| Oct. 6.86 | Apr. 6.48 | Oct. 6.34 | |
| Nov. 6.82 | May 6.37 | Nov. 6.28 | |
| Dec. 6.87 | June 6.32 | Dec. 6.24 | |

In addition, O'Neill calculated the company's rate of return using the method followed by the commission in the original hearing, but with current data, and showed that the company's rate of return decreased from 9.02% (calculated by the commission in its original order as of June 30, 1974) to 7.08% (as of March 31, 1976). The 9.02% rate included the original erosion allowance of 0.3%. The fact that the rate dropped 1.94%, instead of only 0.3%, indicates that the original erosion allowance was inadequate.

We note first that Mr. O'Neill's calculations represent a comparison of the company's actual results with the erosion allowance in question. This is in accord with the previously discussed principles. However, the commission failed to carry this consideration of post test year data far enough. It allowed an erosion adjustment which was based only on one year's experience; that is, it made an *annual* adjustment. When making a prospective adjustment, this would be appropriate. Forecasts are unreliable, and it would not be unreasonable to limit an economic forecast to the effects expected to occur within one year after the test period. But the situation on remand is different. The commission is capable of ascertaining with certainty the effects of inflation right up to the time of

590

the remand. Whether this is one year, or 21 months as in the present case, is irrelevant. So long as the erosion adjustment is going to be updated, there is no reason for arbitrarily limiting it to a one year period. In accord with the standards of reasonableness we have set out, the commission should have made an erosion adjustment on remand which comported with the actual figures up to the time of the remand, and, in addition, reflected the expected erosion for a forseeable period in the future.

Since the commission in effect found that the company's failure to earn its authorized rate of return was due to erosion, it was obligated to make a suitable allowance. Inasmuch as it chose to compensate for erosion by adding to the 1974 rate base an amount equal to the increase in investment, it should at least have added the increase in investment attributable to the *entire* 21 month period preceding the remand, and, in addition, added the projected annual increase of $13,290,000. This augmented rate base, when combined with the other 1974 data, would yield a more meaningful allowed earnings level.

We next turn to the commission's decision with regard to the company's capital structure. In keeping with our decision today, the commission should have relied on 1974 data, in the absence of circumstances indicating a contrary result. In fact, the commission used a 1975 capital structure, which significantly differed from that of 1974 in the proportion of debt and cost-free capital. This resulted in a lower authorized rate of return. Accordingly, the rate of return should be recomputed using the 1974 capital structure which the commission found in its original decision.

II. The Gross Receipts Tax.

The working capital allowance found by the commission in the first proceeding was determined on appeal to be without evidentiary support. The only part of the com-

mission's redetermination to which the company here objects is the exclusion of the gross receipts tax provided by G.L. 1956 (1970 Reenactment) §44-13-1. The company's objection can best be understood if the history of the tax is discussed first.

Initially, the tax was payable in full on March 1 of each year, based on the gross receipts of the utility company for the prior year. In 1968 the payments were accelerated by chapter 26 of title 44.[8] After 1968, the tax formerly due on the first day of March in year two was thereafter to be paid during year one; i.e., the tax was paid in the same year as the receipts upon which it was based were received. As a consequence, the company paid a double tax in 1968.

The commission took the position that, as the system is presently structured, the tax payments coincide with the collection of revenues to pay the tax and that as a result the company did not require working capital to make the payments.

The company argues that this is not the case. Its position is that the tax as first enacted was an expense of year two, the year in which it was paid, and not of year one, the year in which the receipts on which it was based were collected. Thus, when the tax was accelerated in 1968, it became a pre-payment; i.e., a payment in year one of the taxes due in year two. The company did not charge the accelerated tax to expenses in 1968, even though it did in fact pay the tax to the state in that year. Instead, it recorded the payment as prepaid taxes. As a result, the company says, the money to pay the taxes had to come from the investors. This payment of taxes with investors' funds continues each year, the company says, and the investors are entitled to earn a return on this money.

---

[8] Although the acceleration actually took place between 1968 and 1970, to simplify the discussion we will treat the acceleration as having taken place entirely in 1968.

Thus, the amount of the tax should be included in its working capital requirements.

After studying the tax as it was originally enacted and as it has been amended, we conclude that the statutory scheme is ambiguous. It does not clearly indicate to which year the tax applies.

However, the commission relying on the testimony given at the original proceeding by Mr. Robert Towers, an expert called by the Rhode Island Consumers' Council, found as a matter of fact that the tax was not prepaid. According to Towers, test year data is adjusted to reflect the taxes due to current gross receipts when the company's rates are determined. As a result, a part of every dollar of revenue collected by the company includes an allowance for the gross receipts tax liability which is thereby incurred. The testimony of Dr. John Wilson, the commission's expert, was substantially the same. The commission therefore adopted the working capital requirement proposed by Towers at the original hearings, which was $3,449,000. We cannot say that this conclusion was unreasonable or lacking in evidentiary support, and we therefore will not disturb it.

We note that the result reached by the commission seems proper to us. The company clearly could not claim a right to a return on the payment of a current tax. This tax in operation looks exactly like a current tax. It would be strange if a historical bookkeeping technique could alter this situation and enable the company to earn a return on the amount of the tax every year, indefinitely into the future.[9]

---

[9]The company vigorously argues that the commission's decision is not in accord with our opinion in *Rhode Island Consumers' Council v. Smith,* 113 R.I. 232, 240, 319 A.2d 643, 647 (1974). We do not agree. The commission's decision which we approved in that case was in relevant part as follows:

### III. The Return on Equity.

The third issue before us is the propriety of the commission's determination of a return on equity of 11.53%. The company claims this determination was based on faulty and discredited testimony.

It is particularly appropriate here to note our limited appellate function. It is not within our province to determine which testimony is the most accurate, believable, or reliable. That is the task of the commission. A rate of return set by the commission is presumptively reasonable; we will not interefere unless the company demonstrates by clear and convincing evidence that it is clearly, palpably and grossly unreasonable. *Rhode Island Consumers' Council* v. *Smith,* 111 R.I. at 295, 302 A.2d at 772; *Narragansett Elec. Co.* v. *Kennelly,* 88 R.I. 56, 84, 143 A.2d 709, 725 (1958).

The commission considered the testimony of John Cogswell, the company's general financial supervisor, and Robert Stich, a professor at the University of Missouri, both of whom testified for the company. It also considered evidence presented by David Kosh and John Wilson, experts called by the administrator of the Division of Public Utilities.

Mr. Cogswell and Mr. Stich both recommended a return on equity of between 13% and 14%. The commission found that Mr. Stich's estimate, which was based on the earnings of comparable companies, was flawed because the measuring groups were in fact composed of companies

---

" 'After considering the record of the supplementary hearings as well as the record of the prior hearing, we agree with witness Towers that the ultimate cost of state tax adjustment does bring those taxes to a current status.' " *Id.* 240, 319 A.2d at 647.

In any case, any inconsistency between the commission's decision in that case and the present one is not fatal: the commission is not bound by determinations made in prior cases *.Narragansett Elec. Co.* v. *Kennelly,* 88 R.I. 56, 72-73, 143 A.2d 709, 720 (1958).

having dissimilar risk characteristics. The commission also concluded that the projected 6½% growth in earnings per share upon which Mr. Stich's estimate was based was not supported by any evidence.

Mr. Cogswell's testimony was rejected for similar reasons. The commission found that Mr. Cogswell had based his analysis of the competition for capital on a group of companies which had atypically high earnings. It also did not agree with the use of bond ratings as a selection factor for comparable companies.

The commission relied primarily on the testimony of Mr. Wilson, who used the discount cash flow (DCF) method of analysis. We have previously acknowledged the legitimacy of this method of ascertaining equity cost. *Rhode Island Consumers' Council* v. *Smith,* 111 R.I. at 295, 302 A.2d at 771-72.

The company argued at great length that Mr. Wilson's testimony was inaccurate in several respects: that the data he used was distorted, that the "comparable companies" included New England Telephone itself, that some of the "comparable" rates of return were in fact from companies with preferred stock (of which the company has none, and that the "comparable" companies had an unreasonable mixture of high and low bond ratings.

We have considered these arguments but remain unpersuaded for two reasons. First, they are almost exclusively directed to questions of fact which must be answered by the commission, not by us. The commission found Mr. Wilson's testimony to be well-reasoned and based on sufficient evidence. In reviewing the record, we cannot say that this conclusion is clearly wrong. Second, the company failed to demonstrate that the alleged errors resulted in a cost of equity figure that was grossly and palpably unreasonable. Granted, it may be difficult to prove an inadequate return on capital in the absence of a recent

stock issue. *See* 1 Priest, *Principles of Public Utility Regulation* at 199 (1969). Nonetheless, the company failed to show that it could not successfully market its stock, or that the interest of present stockholders was in danger of being diluted, or that any other condition existed which demonstrated that 11.53% was an insufficient return on equity. Accordingly, we will not disturb the finding of the commission.

We therefore reject the company's contention that the commission misconceived the nature of the gross receipts tax and consequently failed to make an adequate working capital allowance. We also reject the company's contention that the commission adopted a return on equity that was based on faulty and discredited testimony. We sustain the company's contention that the erosion adjustment set by the commission did not adequately reflect the company's post test year experience. We also sustain the company's contention that the commission's selective use of post test year experience in calculating the rate of return was erroneous.

The records certified to this court are ordered returned to the commission with our decision endorsed thereon and with a directive that the commission recalculate the erosion adjustment and rate of return in accordance with directions in this opinion.

*Tillinghast, Collins & Graham, Peter J. McGinn, Mark A. Pfeiffer, Richard W. Blackburn,* of Counsel, Boston, Massachusetts, for petitioner.

*Julius Michaelson,* Attorney General, *Gregory L. Benik & R. Daniel Prentiss,* Special Asst. Attorney Generals, for respondent.