404 A.2d 821.

## THE NARRAGANSETT ELECTRIC COMPANY
### *vs.* EDWARD F. BURKE *et al.*

JULY 24, 1979.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

BEVILACQUA, C.J.  The Narragansett Electric Company (Narragansett) has petitioned this court for a writ of certiorari requesting us to review and quash the August 21, 1978 order of the Public Utilities Commission (PUC). The petitioner also seeks our termination of the PUC investigation requested by the Attorney General, who alleged that Narragansett had overcharged its customers by improperly implementing a rate increase granted by the PUC in a January 24, 1972 order.

Prior to 1967, Narragansett supplied electricity partly from its own generator and partly from power purchased from the New England Power Company (NEPCO). During this period, Narragansett operated under a fuel adjustment clause. This clause, which was applied to rates charged of commercial and industrial enterprises, adjusted the price of electricity whenever the cost of fuel utilized by Narragansett rose above or fell below $10.75 per standard net ton. When the cost rose above the $10.75 base rate, Narragansett would recover the amount for its extra outlays from its commercial and industrial customers. When the cost of fuel fell below the base rate price, the fuel clause operated to reflect that difference in credits on the bills of those customers.

In 1967, Narragansett contracted to sell all of the output from its generating plants to NEPCO. Under the terms of this "Integrated Facilities" contract, all of Narragansett's generating costs, including the cost of fuel, were paid by NEPCO. According to the PUC, because the fuel adjustment clause remained in effect under this contract and because the cost of fuel fell approximately $2 below the base rate price, the clause implemented customer credits with no corresponding decrease in fuel costs. This resulted in a situation whereby Narragansett's cost of service was artificially inflated, thus depressing Narragansett's earnings. Recognition of these credits by Narragansett contributed to its November 30, 1970 request for rate relief.

On this date, Narragansett asked the PUC to permit it to increase its rates by $8,899,000 (Docket 1076). These additional revenues, which were based upon a 1970 test year, were to be achieved by a combination of a $7,124,000 increase in base rates and a change in the fuel adjustment clause amounting to $1,765,000. The fuel clause was thus recalculated by lowering the base cost of fuel, so that Narragansett would not have to issue credits in the future for the differential that existed during the test year.

The PUC issued a summary order on January 24, 1972, granting Narragansett additional revenues of $6,448,000. Two days later Narragansett filed new rates in compliance with the January 24, 1972 order. The PUC approved this filing in an order issued on January 28, 1972.

On January 28, 1975, the Attorney General requested the PUC investigation that led to this petition for certiorari. In his request, the Attorney General contended that Narragansett had implemented rates generating $7.8 million, or $1.4 million more than the $6.4 million rate revenues allowed by the PUC in its January 24, 1972 order. Narragansett responded that although the implemented rates would have generated $7.8 million over revenues earned in 1970, these new rates only generated additional revenues of less than $6.4 million when they became effective on January 28, 1972.

Before the PUC, attention focused on the revenue impact caused by substitution of the new fuel adjustment clause for the old fuel clause. Both parties agreed that implementation of the new fuel clause would have produced $1,765,000 in additional revenue during the 1970 test year. Narragansett, however, asserted that elimination of the old fuel clause during 1972 resulted in much less revenue. Narragansett attributed this result to the delay of the PUC in issuing the order due to the 1971 Presidential price freeze, the outdated test year, Narragansett's rapidly deteriorating financial condition and rising fuel costs.

The PUC found that on the basis of these factors, Narragansett implemented rates that allowed only $359,000 of

additional revenues from the fuel clause change, instead of $1.7 million, thus permitting it to increase the base rates by $6,089,000. The problem that ultimately resulted in this certiorari proceeding is that the facts leading to Narragansett's decision to estimate the fuel clause at the $359,000 amount were not raised at the hearing before the PUC and thus do not appear in the record of Docket 1076. Instead, claiming uncertainty as to exactly what portion of the $6.4 million was to be attributed to elimination of the old fuel clause, Narragansett requested the PUC to clarify its order in what the Attorney General describes as an ex parte meeting. Specifically, Narragansett wanted to inquire whether the January 24, 1972 PUC order was based on test year fuel costs so that $1.7 million of the $6.4 million would be attributed to elimination of the old fuel clause, entitling Narragansett to increase its base rates by approximately $4.7 million. In the latter event, Narragansett would adopt its "fuel normalization plan," designating $359,000 instead of $1.7 million to elimination of the old fuel clause, thus taking test year (1970) revenues and normalizing those revenues to reflect December 1971 fuel costs.

The attorney for the Consumers' Council was neither informed of nor attended this meeting, held on January 25, 1972. It is this absence that resulted in the meeting's alleged ex parte status pursuant to G.L. 1956 (1977 Reenactment) §42-35-13[1]. At the meeting, a Narragansett representative took notes to the effect that chairman Smith responded that the test year fuel clause credit was entirely separate from the $6.4 million awarded by the PUC on January 24, 1972. Chairman Smith also instructed Narragansett to implement its final rate design in accordance with its fuel normalization

---

[1]General Laws 1956 (1977 Reenactment) §42-35-13 provides in pertinent part as follows:

"members or employees of an agency assigned to render a decision or to make findings of fact and conclusions of law in a contested case shall not, directly or indirectly, in connection with any issue of fact, communicate with any person or party, nor, in connection with any issue of law, with any party or his represenative, except upon notice and opportunity for all parties to participate * * *."

plan. Before doing so, however, Narragansett met with the Consumers' Council on January 27, 1972 to explain its fuel normalization plan. The PUC approved of these rates implemented by Narragansett on January 28, 1972.

Three years later, the Attorney General requested the PUC to order Narragansett to refund all revenues it had received in excess of the $6.4 million that the PUC found to be reasonable. The Attorney General stressed that a refund was necessary because Narragansett had implemented rates representing a $7.8 million increase. The Attorney General also alleged that Narragansett had wrongfully persuaded the PUC to find that the rates filed pursuant to the fuel normalization plan were in compliance with its order. Moreover, the Attorney General claimed that the presentation at the meeting of January 27, 1972 to explain the rates to the Consumers' Council was incomplete, superficial and misleading.

The PUC found that the record did not warrant a finding that Narragansett had perpetrated a fraud upon the PUC or that any misrepresentation had occurred that alone would warrant setting aside the rates. Nevertheless, the PUC also decided that because the January 24th order was subject to two interpretations, the subject matter of the meeting fell within the definition of a contested case; that the January 25th meeting was not limited to a request for clarification; and that the January 25th meeting therefore possessed ex parte status. The PUC further found that the disclosure meeting of January 27 did not cure the injury or prejudice suffered by the Consumers' Council. The PUC thus ordered Narragansett to refund all revenues collected in excess of those it would have earned had the rates been implemented as authorized by the PUC's decision and order of January 24, 1972 and of March 6, 1972.

In its petition for certiorari, Narragansett argues (1) that the January 25, 1972 meeting was not an illegal, ex parte meeting; (2) that assuming *arguendo* a technical violation of the ex parte statute, the PUC erred in voiding the January 28,

1972 order; (3) that the PUC has no power to award refunds or reparation; and (4) that the PUC erred in holding that Narragansett's compliance rates were unjust and unreasonable. In view of our answer to Narragansett's second and third allegations, which we have discussed concurrently below, we need not address Narragansett's fourth argument.

## I

In support of its position that the January 25th meeting was not an illegal, ex parte communication, Narragansett maintains that the meeting was held merely for the sake of clarifying the January 24th order and that no issue of law or fact was presented for decision by the PUC necessitating a hearing. Narragansett's analysis thus removes the subject matter of the meeting from the Administrative Procedures Act [G.L. 1956 (1977 Reenactment) chapter 35 of title 42] definition of "contested case"[2] and places it within the parameters of this court's decision in *Town of Charlestown* v. *Kennelly*, 80 R.I. 148, 93 A.2d 728 (1953). In *Kennelly*, the public utilities administrator directed the telephone company to submit for his approval a schedule of rates designed to implement his earlier order. We stated that although the better procedure would have dictated giving the opponent an opportunity to be heard on whether the rates conformed with the findings in the PUC decision and its first order, there was no statutory requirement to that effect and no prejuduce had actually resulted. We therefore held that no new notice was required before entry of the order effectuating the admininstrator's decision. In the instant case, Narragansett contends that the PUC, which found that an issue of law or fact existed that could have seriously altered implementation of the rate award, erred in deciding that *Kennelly* did not apply to the alleged clarification meeting.

---

[2]General Laws 1956 (1977 Reenactment) §42-35-1(b) defines "contested case" as follows:

"a proceeding, *including but not restricted to ratemaking*, price fixing, and licensing, in which the legal rights, duties, or privileges of a specific party are required by law to be determined by an agency after an opportunity for hearing." (Emphasis added.)

In G.L. 1956 (1977 Reenactment) §39-5-3,[3] the General Assembly defined the framework within which this court reviews PUC decisions. Under this statutory mandate, we determine whether the decision of the PUC is lawful and reasonable. In so doing, we do not exercise our independent judgment or weigh conflicting evidence, and we will not disturb administrative findings unless the record establishes that the findings are not fairly and substantially supported by legal evidence. *Providence Gas Co.* v. *Burke*, 119 R.I. 487, 497, 380 A.2d 1334, 1339 (1977); *New England Telephone & Telegraph Co.* v. *PUC*, 118 R.I. 570, 575, 376 A.2d 1041, 1044 (1977); *United Transit Co.* v. *Public Utility Hearing Board*, 96 R.I. 435, 445, 192 A.2d 423, 428-29 (1963). *See* G.L. 1956 (1977 Reenactment) §39-5-3. In order to disturb an administrative order, we must be satisfied that the PUC acted illegally, arbitrarily or unreasonably. *See Providence Gas Co.* v. *Burke*, 119 R.I. at 497, 380 A.2d at 1339; *New England Telephone & Telegraph Co.* v. *PUC*, 118 R.I. at 578-79, 376 A.2d at 1044. *See also* §39-5-3. Therefore, if we decide that the PUC erred in finding that an ex parte meeting occurred, or that the PUC acted in excess of its jurisdiction in voiding its January 28, 1972 order and in demanding a refund, then we must quash the PUC's second, remedial order of August 21, 1978, thus permitting its January 28, 1972 order to stand.

We believe that the record clearly supports the finding by the PUC that an ex parte meeting occurred. The testimony of Edward F. Hindle, attorney for Narragansett, establishes that notwithstanding any lack of intent on the part of T. Dexter Clarke, president of Narragansett, to raise a new proposal, the topic of fuel normalization was initially broached at the meeting on January 25. The testimony of

---

[3]General Laws 1956 (1977 Reenactment) §39-5-3 reads as follows:

"Findings of commission.—The findings of the commission on questions of fact shall be held to be prima facie true as found by the commission and the supreme court shall not exercise its independent judgment nor weigh conflicting evidence. An order or judgment of the commission made in the exercise of adminstrative discretion shall not be reversed unless the commission exceeded its authority or acted illegally, arbitrarily or unreasonably."

William McDade, a senior rate engineer at New England Power Service Company, who prepared testimony and exhibits for Narragansett, substantiates that an additional rate design measure via fuel normalization was proposed on January 25. This fact distinguishes the present situation from the approval meeting held in the case of *Town of Charlestown* v. *Kennelly, supra.* Even Mr. Hindle admitted that the subject matter of the January 25th meeting had extended farther than he had anticipated. Because the PUC was asked to approve implementation of the fuel normalization plan, which would result in Narragansett earning a greater revenue than had the 1970 test year fuel adjustment clause estimates been used, the process of ratemaking was technically still in progress. The meeting of January 25 thus fell within the definition of "contested case" contained in §42-35-1(b), so that all parties involved were entitled to an opportunity for a hearing after reasonable notice pursuant to §42-35-9.[4] At the close of the meeting, the PUC instructed Narragansett to implement its fuel normalization plan, thus allowing Narragansett an increase in revenues over the test year by $1.4 million. Because "the legal rights, duties, or privileges" of both Narragansett and the public were determined without a hearing, the proceeding violated §42-35-13, which prohibits agency members from communicating with any person or his representative concerning their prospective findings of fact or decisions of law in a contested case absent notice and an opportunity for all parties to the case to participate.[5] We therefore hold that the finding of the PUC that the January 25 meeting extended

---

[4]General Laws 1956 (1977 Reenactment) §42-35-9 reads, in pertinent part, as follows:

> "(a) In any contested case, all parties shall be afforded an opportunity for hearing after reasonable notice.
>
> * * *
>
> "(c) Opportunity shall be afforded all parties to respond and present evidence and argument on all issues involved.

[5]For the text of §42-35-13, see note 1, *supra.*

farther than a mere request for clarification and thus violated the prohibition against ex parte meetings is fairly and substantially supported by legal evidence.

Despite the fact that an ex parte meeting occurred, the PUC acted in excess of its jurisdiction when it voided its order of January 27, 1972 and ordered Narragansett to refund the amount of revenues collected in excess of those that would have been collected had the rates been designed to comply with the January 24, 1972 order and the March 6, 1972 decision. Although violations of the ex parte prohibition in other factual contexts have led courts to void the agency order or decision, *see, e.g., Camero* v. *United States,* 375 F.2d 777, 780-81 (U.S. Ct. Cl. 1967); *WKAT, Inc.* v. *FCC,* 296 F.2d 375, 382-383 (D.C. Cir. 1961); *Sangamon Valley Television Corp.* v. *United States,* 269 F.2d 221, 224-25 (D.C. Cir. 1959); we choose to follow contrary precedent in a ratemaking setting such as the one before us.

In Rhode Island, although ratemaking is legislatively defined as a quasi-judicial function,[6] *see Blackstone Valley Chamber of Commerce* v. *PUC,* 121 R.I.122, 125, 396 A.2d 102, 104 (1979), *citing Narragansett Electric Co.* v. *Harsch,* 117 R.I. 395, 401, 368 A.2d 1194, 1201 (1977), it is well settled that rates are exclusively prospective in nature and that future rates may not be designed to recoup past losses.[7] *See Narragansett Electric Co.* v. *Burke,* 119 R.I. 559, 565, 381 A.2d 1358, 1364 (1977); *New England Telephone & Telegraph Co.* v. *PUC,* 116 R.I. 356, 388, 358 A.2d 1, 20 (1976). This rule is grounded upon the principle that

---

[6]General Laws 1956 (1977 Reenactment) §39-1-3 provides in pertinent part:

"The commission shall serve as a quasi-judicial tribunal with jurisdiction, powers, and duties to hold investigations and hearings involving the rates, tariffs, tolls and charges * * * of * * * electric * * * public utilities * * *."

[7]This rule has been relaxed only to permit the utility to belatedly collect rates that became presently due where the utilities commission was remiss in its statutory duty. The doctrine, however, has never allowed a utility to recoup retroactively revenues lost even when they are lost due to the fault of the commission. *See Bristol County Water Co.* v. *PUC,* 117 R.I. 89, 98 n.2, 363 A.2d 444, 449 n.2 (1976).

"when a commission pronounces that a specific rate is a 'reasonable and lawful rate for the future,' that pronouncement has the force and effect of a statute." *New England Telephone & Telegraph Co.* v. *PUC*, 116 R.I. at 388, 358 A.2d at 20. The rule that rates are exclusively prospective was first enunciated by the Supreme Court in *Arizona Grocery Co.* v. *Atchison, Topeka & Santa Fe Railway*, 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932). In *Arizona Grocery Co.* the Court held that a public utilities commission cannot repeal its own earlier-approved rates by later finding them unreasonable. The Court posited that the rates allowed by the commission had the force and effect of a statute upon which the utility was entitled to rely. *Id.* at 386, 389, 52 S.Ct. at 185, 186, 76 L.Ed. at 354, 355. Application of any other rule would encourage each ratemaking hearing to continue indefinitely, encouraging waste of administrative time and resources and discouraging reliance on commission decisions.

We therefore hold that the PUC acted illegally in voiding its order of January 27, 1972, and in ordering Narragansett to refund revenues paid by customers in excess of the rates originally intended by the PUC in its January 24, 1972 order.

Although the rationale behind the rule that rates are exclusively prospective is to avoid doing injustice to those who rely on PUC rate orders, the result engendered by use of the rule in this case may appear inequitable to the customers who paid the excessive rates. We note, however, that although there has been an ex parte communication in violation of §42-35-13,[8] this section applies only to members and employ-

---

[8] G.L. 1956 (1977 Reenactment) §42-35-13 reads as follows:

"Ex parte consultations.—Unless required for the disposition of ex parte matters authorized by law, members or employees of an agency assigned to render a decision or to make findings of fact and conclusions of law in a contested case shall not, directly or indirectly, in connection with any issue of fact, communicate with any person or party, nor, in connection with any issue of law, with any party or his representative, except upon notice and opportunity for all parties to participate; but any agency member
  (a) may communicate with other members of the agency, and
  (b) may have the aid and advise of one or more personal assistants."

ees of the particular agency, not to interested parties such as Narragansett.[9] It is thus the PUC, not the representatives of Narragansett, that has violated the prohibition of §42-35-13 by mistakenly permitting the clarification meeting to metamorphose into an ex parte communication. Although the PUC may now wish to remedy its over-sight, it remains subject to the judicially-created, commission-made rate doctrine until the General Assembly declares otherwise. As a creation of the General Assembly, the PUC derives all of its powers, duties and responsibilities from its enabling act. *Bristol County Water Co. v. PUC*, 117 R.I. 89, 97, 363 A.2d 444, 449 (1976).

Although the General Assembly amended the Public Utilities & Carriers Act in 1975, giving the Division of Public Utilities and Carriers the power to order refunds, *see* §39-3-13.1,[10] it is the rule in Rhode Island that absent legis-

---

[9]Parties interested in the outcome of the dispute do not fall within the prohibition of §42-35-13. In this manner the Rhode Island statute is more limited than its federal counterpart, 5 U.S.C.A. §557 (1977). The federal version of §42-35-13 contains not only a subsection that parallels the §42-35-13 prohibition against communications instigated by the agency, but also a subsection prohibiting all interested persons from engaging in ex parte communication with members or employees of the agency or an administrative judge. *Compare* §42-35-13 (*see* note 8, *supra*) *with* 5 U.S.C.A. §§557(d)(1)(A) and (B) at 352 (1977), which read as follows:

"(A) no interested person outside the agency shall make or knowingly cause to be made to any member of the body comprising the agency, administrative law judge, or other employee who is or may reasonably be expected to be involved in the decisional process of the proceeding, an ex parte communication relevant to the merits of the proceeding;

"(B) no member of the body comprising the agency, administrative law judge, or other employee who is or may reasonably be expected to be involved in the decisional process of the proceeding, shall make or knowingly cause to be made to any interested person outside the agency an ex parte communication relevant to the merits of the proceeding."

There is no companion section to §557(d)(1)(A) in the Rhode Island statute.

[10]General Laws 1956 (1977 Reenactment) §39-3-13.1 reads as follows:

"Power to order refunds.—The said division shall have the power, when deemed by it necessary to provide remedial relief from unjust, unreasonable, or discriminatory acts, or from any matter, act or thing done by a public utility which matter, act or thing is in chapters 1 to 5, inclusive, of this title, or otherwise, prohibited or declared to be unlawful, to order the said public utility to make restitution to any

lative guidance to the contrary, a statute will not be given retroactive application if it creates, defines and regulates substantive legal rights. *See Fox* v. *Fox,* 115 R.I. 593, 596-97, 350 A.2d 602, 604 (1976); *Cipriano* v. *Personnel Appeal Board,* 114 R.I. 141, 144, 330 A.2d 71, 73 (1975); *Norton* v. *Paolino,* 113 R.I. 728, 733, 327 A.2d 275, 278 (1974). Because §39-3-13.1 affects a vested substantive right, it is limited solely to prospective use by the PUC and therefore cannot be invoked in this case.[11]

For the reasons stated above, Narragansett's petition for certiorari is granted, the August 21, 1978 PUC order is quashed, and the record is remanded to the PUC with our decision endorsed thereon.

*Pasco Gasbarro, Jr., Samuel Huntington,* for petitioner.

*Dennis J. Roberts II,* Attorney General, *R. Daniel Prentiss, Esq.,* for respondent.

---

party or parties, individually or as a class, injured by said prohibited or unlawful acts, by way of a cash refund, billing credit or rate adjustment, or any other form of relief which the division may devise to do equity to the parties. Any award made in restitution shall carry interest from the date of the injury, at the rate of seven (7%) per cent from the date of the order of the division."

[11]For purposes of this discussion, we assume without deciding that §39-3-13.1 applies to the PUC as well as to the Division of Public Utilities and Carriers.