**NEWPORT ELECTRIC CORPORATION**

v.

**The PUBLIC UTILITIES COMMISSION.**

**No. 92–479–M.P.**

Supreme Court of Rhode Island.

May 26, 1993.

Peter McGinn, Joanne Conte, Tillinghast, Collins & Graham, Providence, David Fazzone, Boston, MA, for plaintiff.

Adrienne Southgate, Public Utilities Com'n, Julio C. Mazzoli, Asst. Atty. Gen., for defendant.

## OPINION

FAY, Chief Justice.

This is a statutory petition for writ of certiorari brought by the Newport Electric Corporation (Newport Electric) pursuant to G.L.1956 (1990 Reenactment) § 39–5–1, seeking a review of the report and order of the Public Utilities Commission (commission) issued in docket No. 2036. The commission has ordered Newport Electric to make an accounting adjustment in its financial records regarding the transfer, to a related entity, of a right to an ownership interest in another electric-generation plant.

Cases involving the commission are usually very complex and fact oriented; this case upholds that hallowed reputation and tradition. The commission and this court have taken great pains to recreate the factual atmosphere surrounding this dispute.

In November 1984 Newport Electric entered into a memorandum of understanding between a consortium of firms interested either in developing a power-generation project or in purchasing electricity from such a project. The project was organized

by a partnership primarily consisting of utilities. Also, in November Newport Electric made its first payment totaling $2,900 toward the Ocean State Power Project (project). Beginning in 1984 and ending in 1989, Newport Electric made cash payments of $654,000 to the project to cover preconstruction financing or "soft costs" during the initial stages of the project. The other participants supporting the project also made pro-rata contributions based upon their financial interest in the project. The project entailed building a 500–megawatt, combined-cycle, gas-fired electric-generation plant in Burrillville. The project consisted of two separate phases, each 250 megawatts in size, known as Ocean State Power I (OSP I) and Ocean State Power II (OSP II). The two phases were permitted jointly but constructed separately. The estimated cost of the project was approximately $450 million.

In October 1988 the Rhode Island Energy Facility Siting Board (EFSB) approved the project and granted a license for its construction. A number of power-sales contracts, which are agreements to purchase the electricity to be generated by the power plant, were certified to be in place and binding during the EFSB hearings. Newport Electric agreed to purchase 5 percent of the power to be generated by the project.

In December 1988 NECO Power Corporation (NECO), a wholly owned subsidiary of Newport Electric, formally acquired a right to a 4.9 percent equity interest in the project.[1] The right was exercisable at a cost of $11 million. Newport Electric signed an equity-contribution support agreement guaranteeing the equity investment of NECO. The equity-investment agreement was enforceable once the project was declared operational. Also, in December 1988 construction financing was obtained for OSP I. The initial contributors to the project were then refunded their early payments. In September 1989 con-

struction financing for OSP II was obtained.

In March 1990 Eastern Utilities Associates (EUA) purchased Newport Electric from NECO Enterprises. Because Newport Electric was facing some financial difficulties, EUA gave the commission assurances that it would bring the equity level of Newport Electric to 40 percent by March 1992. By March 1992 EUA had increased the equity level of Newport Electric from 26 percent to 40 percent by making a $9 million infusion of capital. During that two-year period EUA did not take any dividends from Newport Electric. Prior to its purchase of Newport Electric, EUA had a right to an equity interest in the project of 25 percent.

In July 1990 Newport Electric's board of directors approved a motion to transfer its right to purchase an equity interest in the project to Eastern Utilities Associates–Ocean State, a wholly owned subsidiary of EUA. In December 1991 OSP I was declared operational, qualifying for a $12,200,000 investment tax credit. Also, during December documents finalizing the transfer of Newport Electric's right to purchase an equity interest in the project were signed and finalized. Newport Electric did not make any accounting entry in its financial records noting the transfer of the right to the equity interest in the project. Eastern Utilities Associates–Ocean State (EUA–OS) subsequently invested the $11 million and received the 4.9 percent equity interest in the project. In November 1991 OSP II was declared operational.

At this point we are compelled to retrace summarily the travel of the right to the 4.9 percent equity interest in the project. The right was acquired by NECO, a wholly owned subsidiary of Newport Electric, and then was transferred to EUA–OS, a wholly owned subsidiary of EUA, which is the parent of Newport Electric. This travel involved the transfer of a valuable asset to an affiliated, unregulated arm of the par-

---

1. In July 1989 NECO Power Corporation changed its name to Newport Electric Power Corporation.

ent company without any form of compensation.

After holding a special hearing to investigate the travel of the right to the equity interest, the commission ordered Newport Electric to record the transaction by crediting a gain of $1,200,000 on the disposition of the interest against its Storm Contingency Fund (the fund). Prior to this entry the fund had a $1,200,000 deficit balance. The purpose of maintaining the fund is to build up a reserve to pay the cost of service restoration resulting from power outages brought about by severe weather conditions. The objective of the commission's accounting directive was to guide the gain on the disposition of the right to the equity interest toward Newport Electric's ratepayers.

Newport Electric avers that the commission's accounting directive is unsupported by any evidence and incorrect as a matter of law. Newport Electric argues that the shareholders and not the ratepayers were liable for the interest in the project and that consequently the ratepayers cannot benefit by the disposition of the interest. The commission believes that the ratepayers were ultimately responsible for the investment in the project and consequently avers that the accounting directive and the order were both reasonable and within its power.

Newport Electric also challenges the role of the commission during the proceedings. Newport Electric contends that the commission abandoned its detached neutral role by calling its own witnesses.

■ We note at the onset that we have limited power in reviewing regulatory proceedings. The role of factfinder in utilities cases is that of the commission alone, and our review is limited to whether the decision of the commission was fairly and substantially supported by legal evidence specific enough to enable us to ascertain if the facts upon which the commission's decision is premised afford a reasonable basis for the result reached. *Michaelson v. New England Telephone & Telegraph Co.,* 121 R.I. 722, 404 A.2d 799 (1979). *See also Providence Gas Co. v. Burke,* 119 R.I. 487,

380 A.2d 1334 (1977); *New England Telephone & Telegraph Co. v. Public Utilities Commission,* 118 R.I. 570, 376 A.2d 1041 (1977). In order to disturb an administrative order, we must be satisfied that the commission acted illegally, arbitrarily, or unreasonably. *Narragansett Electric Co. v. Burke,* 122 R.I. 13, 404 A.2d 821 (1979), *cert. denied,* 444 U.S. 1079, 100 S.Ct. 1031, 62 L.Ed.2d 763 (1980). *See* G.L.1956 (1990 Reenactment) § 39–5–3.

■ "The rate-making process * * * involves a balancing of the investor and the consumer interests." *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333, 345 (1944). The rate base is the scale used in balancing those interests. A rate base represents the total investment in the facilities of a utility used in providing the service. To arrive at the allowed return a utility may earn, the rate base is multiplied by a percentage called a rate of return. The rate base is then recovered through the rates charged to the utility customers. To simplify matters, a utility with a rate base of $1 million and a rate of return of 6 percent would be allowed to earn $60,000. *See* 1 Priest, *Principles of Public Utility Regulation,* 139 (1969).

■ We have defined "rate base" as "the utility's total investment in, or the fair market value of, the used and useful property necessarily devoted to the rendering of the regulated service." *Providence Gas Co. v. Burke,* 448 A.2d 773, 774 n.2 (R.I. 1982). The elements of value may be either tangible or intangible but the traditional test is whether the questioned property is "used and useful." A horse and buggy might conceivably be used in a modern facility, but it may not be very useful because of other modern-day modes of transportation. On the other hand, property ordered and purchased but for other reasons not placed into service might be useful but not used. *See* Welch, *Cases and Texts on Public Utility Regulation,* 357 (rev. ed.1968).

■ Operating or above-the-line expenses are borne by the ratepayer while

income deductions or below-the-line expenses are borne by the shareholders of the company. *Providence Gas Co. v. Burman*, 119 R.I. 78, 99 n.14, 376 A.2d 687, 698 n.14 (1977). Operating expenses consist of the cost of labor and materials incurred for furnishing the services and for maintaining the properties used in providing the services. Operating expenses, when deducted from operating revenues, yield net operating revenues. This issue is very critical in utilities regulation because it is the demarcation in the income statement that separates above-the-line expenses from below-the-line expenses. The above-the-line and below-the-line concept can be best explained by identifying that line as the one drawn beneath operating expenses when deducting those expenses from operating revenues. Expenses occurring above the line are charged to the ratepayer since they are incurred in supplying the regulated service and consequently become part of the rate base. *See* Suelflow, *Public Utility Accounting: Theory and Application*, 23–24 (1973).

■ Our analysis must uncover whether the right to purchase the equity interest in the project belonged to the ratepayers or the shareholders of Newport Electric. If the right to the equity interest is used and useful property, then any gain on the disposition of that interest belongs in the rate base and consequently benefits the ratepayers and not the shareholders. Likewise, if the soft-cost payments are classified as operating expenses, then the resulting right to the equity interest would migrate to the ratepayers. Conversely, if the equity interest is not used and useful property or the soft-cost payments are not operating expenses, then the right to the equity interest belongs to the shareholders.

The preconstruction advances that Newport Electric made to the project were recorded in Newport Electric's financial records in a deferred account entitled "Preliminary Survey and Investigation Charges." The repayment of the advances was credited to the same account. The payments were never recorded in any plant account of Newport Electric.

In its report and order, the commission stated that

"[i]t became clear during the hearings that, *in addition to the ownership interest*, Newport Electric Corporation had a contract to purchase capacity and energy from Ocean State Power. *These two contracts were separate* and, although Newport 'gave up its equity ownership' [it maintained] its right to purchase five percent of the output of the energy from the plants." (Emphasis added.)

We find it extremely important that the right to purchase the equity interest and the purchase-power contract entered into by Newport Electric were separate and independent agreements. An interested party in the project could simply agree to purchase power to be generated by the project without entering into any equity agreement. Although a purchase-power contract may be indirectly related to any equity interest in the project, we find the right to an equity-ownership interest in the project to be a distinguishable and separate facet of the financial foundation in the project.

The initial financial contributions covering the soft costs of the project were offered with the concomitant risk that they may never be recovered. The record reflects that the initial contributions to the project were at risk and that all parties involved in the project understood that there was no hope of rate recovery through the rate base. Because the initial pro-rata contributions to the project were directly related to the right to an equity interest that a particular participant in the project received, it is only logical and reasonable that whoever was responsible for those contributions would also have the right to the equity interest.

The record reflects that the construction financing for the project was designed so that no resulting financial risk would be placed on the ratepayer. The construction risks were placed entirely on the lenders. If the project never was declared commercial, or new environmental laws barred the operation of the plant, the lenders were financially responsible for whatever was

sitting on the site. There was no commitment to put any equity into the project until the time it was declared operational.

■ A utility cannot expect a customer to pay for property not used in the rendition of services. *Valley Gas Co. v. Burke,* 122 R.I. 374, 381, 406 A.2d 366, 371 (1979). Newport Electric's independent right to purchase the equity interest in the project was never devoted to utility service; it was merely a potential for investment. The initial soft-cost payments were not invested in any used and useful property of Newport Electric. We believe that if Newport Electric had initially tried to include these payments in its rate base, neither the commission nor this court would have allowed such a maneuver.

In *South County Gas Co. v. Burke,* 551 A.2d 22 (R.I.1988), this court adopted a support test whereby we divided a gain on the disposition of utility real estate on the basis of the percentage of the financial burden of the property that each party bore. Ratepayers should receive recognition to the extent that they contributed to the asset. It is our conclusion that Newport Electric ratepayers did not contribute to the project. Therefore, we find that they should not be rewarded with any right

to the ownership interest in the project. Because the soft-cost contributions were below-the-line expenses, neither those costs nor the resulting right to the ownership interest was in any way supported by the ratepayers of Newport Electric.

Relying on the disposition of the preceding issue, we need not reach the merits of the second argument raised by Newport Electric.

The commission's accounting order is unreasonable and not substantially supported by the evidence. Accordingly, for the reasons heretofore stated, Newport Electric's petition for certiorari is granted. The commission's order directing Newport Electric to record a gain on the disposition of the right to the equity ownership interest is quashed. The records certified to this court are remanded to the commission with our decision endorsed thereon.

MURRAY, J., did not participate.