406 A.2d 366.

VALLEY GAS COMPANY *vs.* EDWARD F. BURKE.

JULIUS C. MICHAELSON *et al. vs.* VALLEY GAS COMPANY.

October 1, 1979.

PRESENT: Bevilacqua, C.J., Kelleher, Doris and Weisberger, JJ.

BEVILACQUA, C.J. On July 1, 1977, the Valley Gas Company (the company) filed a revised tariff schedule with the Public Utilities Commission (the commission). This proposed new schedule was designed to increase the company's annual revenues by approximately $2.4 million.[1] Exerting a power conferred by G.L. 1956 (1977 Reenactment) §39-3-11, the commission suspended implementation of the new rate schedule and began a series of hearings on the company's proposal. Those hearings commenced in January 1978 and continued until May 1978.

On June 14, 1978, the commission issued its decision and order in this case. The commission's decision examined the evidence presented by both the company and the Rhode Island Division of Public Utilities and Carriers (the division) concerning the company's rate base, cost of providing service and the rate of return to which the company was entitled. The commission concluded that although the company's current rate structure was indeed inadequate, the proposed revenue increase of $2.4 million was excessive and unreasonable. The commisssion therefore denied the proposed tariff and ordered the company to submit new tariffs designed to produce a revenue increase of $1.8 million.

---

[1] The company filed an additional revised tariff schedule in March 1978. The revised filing contained supplemental data for an updated test year ending December 31, 1977. The original filing request employed a 1976 test year. The commission allowed the new filing with the caveat that the amount of increased revenues not exceed the originally requested total of $2.4 million.

Both the company and the Attorney General responded to the commission's action by filing separate statutory petitions for certiorari pursuant to §39-5-1. We have consolidated those petitions.[2]

On certiorari, the company presents three challenges to the commission's decision. Initially, the company contends that the commission failed to allow for the recovery of certain of its capital investments through depreciation and amortization. Additionally, the company asserts that the commission incorrectly calculated its working capital requirements. Finally, the company argues that the commission erroneously used a purchased-gas refund from the company's suppliers to reduce the company's operating expenses. Representing the division, the Attorney General objects to the commission's allowance of an attrition adjustment and the treatment of the company's deferred tax obligation.

Before proceeding to consideration of the various claims made by both the company and the Attorney General, we caution that we do not sit as factfinders in public utility rate cases. That role belongs exclusively to the commission under the provisions of §39-5-3. *See Michaelson* v. *New England Telephone & Telegraph Co.*, 121 R.I. 722, 404 A.2d 799 (1979). Our function is to determine whether the commission's decision on a particular issue is "fairly and substantially supported by legal evidence and sufficiently specific to enable us to ascertain if the facts upon which [it is] premised afford a reasonable basis for the result reached." *Rhode Island Consumers' Council* v. *Smith*, 111 R.I. 271, 277, 302 A.2d 757, 762-63 (1973). *See New England Telephone & Telegraph Co.* v. *Public Utilities Commission*, 118 R.I. 570, 575, 376 A.2d 1041, 1044 (1977). In so doing, we do not weigh conflicting evidence presented to the commission. *See Blackstone Valley Chamber of Commerce* v. *Public Utilities Commission*, 121 R.I. 122, 127, 396 A.2d 102, 105 (1979). Judicial inquiry ceases when we find in the record sufficient relevant and material evidence to form a rational basis for the conclusions reached by the commission.

[2]The Rhode Island Consumers' Council intervened in No. 78-223 - M.P. in order to sustain the commission's decision on the depreciation issue.

## I Depreciation Deficiency

In 1975, the company commissioned Ebasco Services, Incorporated, to perform a depreciation study. The study included an examination of the company's present depreciation accounting practice and the adequacy of its depreciation reserves. Additionally, the study was to contain proposals for the treatment of any discrepancy between the newly calculated reserve and the actual reserve carried on the company's books.

The company submitted the Ebasco study as an exhibit in the proceedings before the commission.[3] The Ebasco employee who supervised the study, Julius Breitling, testified for the company. According to Breitling, the study showed that the company had been applying an insufficient depreciation rate to its plant in service. Breitling testified that the company's depreciation rate should be raised from 1.9 percent to 2.6 percent to alleviate this problem and that the new rate should be applied over the remaining life of the property currently in service.[4]

Mr. Breitling further observed that even adopting the higher depreciation rate would not serve to allow the company to recover the full investment made in its property. According to Breitling, the company's low depreciation rate had resulted in the inadequacy of the company's reserve for depreciation. Specifically, Breitling found that the company's book reserve of $6,103,807 was $1,013,757 less than the newly computed reserve requirement of $7,117,654. In order for investors to recover this deficiency, Breitling proposed an annual amortization expense of $31,324.

While accepting the company's position that the higher depreciation rate itself was justified, the commission reduced the company's rate base by the approximately $1 million depreciation deficiency. The commission reasoned that *Commission,* 120 R.I. 959, 963, 393 A.2d 1092, 1094 (1978) with respect to the depreciation charges, however, the

---

[3]The study was based upon the company's plant in service as of December 31, 1975.

[4]The 1.9 percent depreciation rate resulted from a 1969 depreciation study.

because this property was no longer being used to provide service, it should not be a component of the rate base upon which customers must provide revenues to support a rate of return.

The commission also rejected the company's request to amortize the deficiency. The commission based its ruling upon testimony by the division's witness, Mr. Galligan, that the company had received excessive earnings in the past because the rate base has been artificially inflated with assets that should have been depreciated. According to the commission, the company had failed to produce evidence to show that these revenues not only provided a fair rate of return but also the amount that would have been charged to operating expense had the assets been properly depreciated.

The company contends that the commission's decision represents an unconstitutional confiscation of that property making up the calculated depreciation reserve deficiency. Specifically, the company asserts that the removal of this property from the rate base prevents investors from earning a fair rate of return from their investment. Additionally, the company maintains that the failure to amortize the deficiency denies investors their right to recover their investment.

None of the parties to these proceedings questions the company's right to employ amortization to allow recovery of capital investments during their estimated service lives. Clearly, the cost of furnishing public utility services includes the value of the physical plant and equipment consumed in rendering that service. This computation is the true measure of depreciation, and customers receiving the service that caused this wearing-out should pay for the cost of the property used in their behalf. See Bonbright, *Principles of Public Utility Regulation*, 198 (1969); Kolb & Lipstreu, *New Concepts and Current Issues in Public Utility Regulation*, 10-11 (1963).

As the proponent of the proposed rate increase, the company has the statutory burden of proof with respect to the component elements of its request, including depreciation expense. §39-3-12. See *United States* v. *Public Utilities*

company presented no evidence whether earnings during the life of the property involved sufficiently exceeded the fair rate of return to compensate investors for the inadequate depreciation charges. The commission did, on the other hand, make the reasonable inference from the division's testimony that the inflated rate base provided investors with remuneration for the depreciation undercharges from actual earnings over and above the fair rate of return.

In support of its contention that investors have not been adequately compensated, the company points to the fact that during the past several years, the company has failed to earn the rate of return established by the commission. We cannot say, however, that the fact that the returns over a 5-year period were below administratively fixed levels conclusively demonstrates that there were no periods during the life of the property in which excesses of earnings over fair returns either wholly or partially provided reimbursement for the depreciation deficiency.

While we appreciate the company's difficulty in tracing its historical depreciation practices, the fact remains that the commission's acceptance of the company's request would be based upon speculation. We find no evidence in the record upon which the propriety of its proposal could be sustained. The commission's decision to disallow any amortization of the deficiency was, therefore, reasonable.[5] *Accord, Williams v. Washington Metropolitan Area Transit Commission*, 415 F.2d 922, 955 (D.C. Cir. 1968); *Washington Gas Light Co. v. Baker*, 88 U.S. App. D.C. 115, 125, 188 F.2d 11, 21, *cert. denied*, 340 U.S. 952, 71 S. Ct. 571, 95 L. Ed. 686 (1951);

---

[5] The company contends that such a result is inconsistent with our holding in *Narragansett Electric Co.* v. *Kennelly*, 88 R.I. 56, 78-79, 143 A.2d 709, 722-23 (1958). In *Kennelly* we approved removal from the rate base of an amount representing a depreciation deficiency. In so doing, we noted that the administrator had increased the annual depreciation rate to allow recovery of the deficiency. *Id.* at 78-79, 143 A.2d at 722.

The need for such a recovery was not, however, at issue in *Kennelly*. We reiterate that we do not reject the company's entitlement to collect the deficiency; our concern here today is with the absence of sufficient evidence to support its recovery.

*United States Steel Corp.* v. *Pennsylvania Public Utility Commission,* 37 Pa. Commonw. Ct. 195, 390 A.2d 849, 860-61 (1978); *Pennsylvania Power & Light Co.* v. *Pennsylvania Public Utility Comm'n,* 10 Pa. Commw. Ct. 328, 341-43, 311 A.2d 151, 158-59 (1973).

Our decision regarding the amortization issue mandates that the depreciation deficiency be removed from the rate base. Depreciation reflects the reduction in service value of an asset committed to rendering service. The removal of depreciated property from rate-base valuation does not result in confiscation because the utility has no right to expect consumers to pay for property no longer used for rendering services. Wilson, Herring & Eutsler, *Public Utility Regulation,* 201-02 (1935). The deduction makes the rate base portray the company's net investment in used and useful property upon which investors should expect a rate of return. *See Narragansett Electric Co.* v. *Kennelly,* 88 R.I. 56, 78, 143 A.2d 709, 722 (1958); Bonbright, *supra* at 198. Having determined that the cost of the depreciation deficiency had been recovered, the commission properly removed it from the rate base.

## II  Purchased-Gas Expense

In 1977 the company received a refund from its gas supplier totaling $956,000.[6] By a previous ruling, the commission had ordered some $756,000 returned to the company's regular customers. The remaining $200,000 represents refunds on gas purchased from the company by contractual customers. These customers do not fall within the ambit of the statute, and the company is under no obligation to refund those funds directly. See *Providence Gas Co.* v. *Burke,* 119 R.I. 487, 491, 380 A.2d 1334, 1336 (1977).

With respect to the proposed rates at issue here, the commission chose to treat the retained $200,000 as a

---

[6]The refund reflects adjustments on purchased-gas charges during the period 1974-75.

windfall-income item not to be included in the test-year calculations.[7] The commission did, however, order that the money be returned to the company's customers by reducing the company's operating expenses for a 3-year period at a yearly rate of $66,000.

The company maintains that the commission's action was arbitrary and unlawful because, in prior rate cases, the commission did not allow utilities to recover extraordinary losses. Moreover, the company contends that prior instances of "extraordinary income" have not been subject to similar treatment.

The short answer to the company's position is that the commission is not bound by the methodology employed in considering prior applications. *See United States* v. *Public Utilities Commission*, 120 R.I. at 966, 393 A.2d at 1096; *quoting Permian Basin Area Rate Cases*, 390 U.S. 747, 776-77, 88 S. Ct. 1344, 1365, 20 L. Ed. 2d 312, 342 (1968). Our concern is whether the commission's end result in each case is lawful and reasonable as gleaned from the record. *Rhode Island Consumers' Council* v. *Smith*, 111 R.I. at 280, 302 A.2d at 764.

Here, the record shows that the refund in issue reduced the company's overall purchase expenses. We acknowledge that this refund involves customers who contracted for gas at a set price and would not, under the terms of their contract with the company, be entitled to a direct reduction in their purchase price. Nevertheless, the customer revenue needed to meet total purchased-gas expense is lowered by virtue of the refund. We therefore find it reasonable for the commission to attempt to reach an equitable result by reducing the company's general purchased-gas expense by the amount of the refund.

### III   Cash Working Capital

The company next challenges the commission's deduction

---

[7]Such nonrecurring items are ordinarily excluded from test-year calculations. *Rhode Island Consumers' Council* v. *Smith*, 113 R.I. 384, 397, 322 A.2d 17, 24 (1974).

from the rate base of $102,856 as negative cash working capital. We have previously stated that cash working capital represents "the amount of cash required to operate a utility during the interim (the 'lag') between the rendition of service and the receipt of payment therefor." *Michaelson* v. *New England Telephone & Telegraph Co.*, 121 R.I. 722, 404 A.2d 799 (1979). *See also Providence Gas Co.* v. *Burman*, 119 R.I. 78, 87, 376 A.2d 687, 693 (1977); *Rhode Island Consumers' Council* v. *Smith*, 111 R.I. at 288-89, 302 A.2d at 768. Revenues that the company collects prior to the time when it must make payments associated with that service are known as "leads." *Michaelson* v. *New England Telephone & Telegraph Co.*, *supra*. A lead-lag study matches these factors and produces a figure that represents the company's monetary requirements for meeting its daily operating expenses. A negative working capital requirement simply means that the company is receiving more than enough customer revenue to cover its operating expenses. *See Providence Gas Co.* v. *Burman*, 119 R.I. at 88, 376 A.2d at 693.

In its prefiled testimony, the company had included a lead-lag study which showed a negative cash working capital requirement of $102,856. However, the company made a working capital allowance of zero when computing its proposed rate base.

The company presented testimony through its witness, Mr. Kenneth Hogan, in an attempt to explain the reason behind the discrepancy. According to Mr. Hogan, many of the accounts receivable listed in the study as being collected within 75 days were not, in fact, collected until much later. Secondly, Mr. Hogan testified that the borrowing rate used in the study was too low and that the actual level of company borrowing necessitated that it maintain a higher compensating balance. Mr. Hogan asserted that both of these factors would serve to decrease the amount of capital on hand and thus change the company's cash working capital requirement from a negative figure to zero.

The division's witness, Mr. Richard Galligan, urged that the company's lead-lag study be accepted and that the

$102,856 be deducted from the rate base. Mr. Galligan based his argument upon the fact that the study showed that the company's customers had furnished more than enough revenue to meet current operating expenses. In effect, Mr. Galligan contended that the customers, and not the investors, were furnishing this capital to the company, and therefore inclusion in the rate base was not justified.[9]

Before us, the company maintains that the testimony of its witness adequately explained the discrepancy between the study and the proposed rate base. Having proved the unreliability of the study, the company argues that the commission acted unreasonably in using it to render its decision.

Our examination of the record finds ample justification for the commission's decision to use the lead-lag study. In testimony before the commission, the division's witness, Mr. Galligan, cast doubt on the validity of the company's explanation for the discrepancy. Mr. Galligan testified that his examination of the company's records shows that the borrowing level listed in the study was not unusually low. With regard to the statement about accounts receivable, Mr. Galligan observed that the company had failed to produce any specific information on the amount of overdue accounts that existed and opined that the company's explanation was a belated "rationalization." Faced with this conflicting testimony, we think it entirely reasonable for the commission to employ the company's original study.

## IV    Attrition Allowance

In its decision, the commission approved the company's proposal for an attrition allowance of $206,610. The company's witness, Mr. Hogan, testified that he calculated the proposed adjustment by applying an annual inflation rate of 6 percent to certain operating expenses.

---

[9]Working capital is an essential rate base item where investors furnish the fund, because such investors are entitled to earn a return on all funds which they have committed to providing service. *Pacific Tel. & Tel. Co.* v. *Public Util. Comm'n.*, 62 Cal. 2d 634, 664, 401 P.2d 353, 371, 44 Cal. Rptr. 1, 19 (1965).

Mr. Hogan also testified that he used an article entitled: "An Uneasy Balance for the United States Economy," *BUSINESS WEEK* December 26, 1977, as the source of his testimony concerning the 6 percent inflation factor. The article contained the collective opinion . of twenty-seven leading economists that price increases would average 6 percent for 1978. The company sought to introduce the article into evidence. The division objected on the grounds that the article contained the assertions of the economists/ authors involved and was, therefore, hearsay. The commission sustained the objections and excluded the article.

The division presented testimony through its expert witness, Mr. Galligan, that the company required no adjustment for inflation. Mr. Galligan argued that any inflationary effects were compensated for by the fact that the company's operating expenses were based upon an updated test year which accounts for inflationary trends. Furthermore, the witness testified that the company's calculations failed to take into account any offsetting savings achieved through increased productivity. Notwithstanding these statements, Mr. Galligan's written prefiled testimony showed that the company's earnings had fallen by some $500,000 during the period 1976-77.

The Attorney General now maintains that the company had failed to introduce any competent evidence to support its proposed attrition adjustment. Therefore, the argument runs, the commission's acceptance of the company's proposal becomes arbitrary and unreasonable. In that regard, the Attorney General points to the fact that the magazine article from which the inflation figure was derived was excluded from the record. Alternatively, the Attorney General maintains that Mr. Hogan's testimony was valueless because he lacked expertise on the issue of attrition calculation. The state further argues that the testimony of the division's witness, Mr. Galligan, constitutes the only substantial competent evidence upon which the commission could have denied the adjustment.

The narrow issue to be determined here is whether the commission's decision to employ the company's study can be supported by the record. It is uncontroverted that the commission itself excluded from the record the magazine article containing the 6 percent figure. Mr. Hogan himself testified that the figure was used in computing the company's proposal. The proposal was, therefore, unsupported by evidence contained in the record, and its use by the commission cannot be justified.

In its decision, the commission observes that although it excluded from the record the article giving rise to the 6 percent figure, the same figure was used in prior cases before the commission. Notwithstanding this prior use, the fact remains that the figure was never properly placed upon the record before the commission and therefore cannot be used to support its decision.

We are therefore constrained to conclude that the record is barren of any evidence to support the commission's finding that an attrition adjustment of $206,610 was essential to compensate the company for any erosion of earnings. We therefore vacate the commission's adjustment and remand the matter to the commission to make an adjustment that is supported by the record. See *New England Telephone & Telegraph Co.* v. *Public Utilities Commission,* 118 R.I. 570, 576-77, 376 A.2d 1041, 1044-45 (1977).

## V  Deferred Taxes

We next consider the Attorney General's challenge to the commission's allowance of $86,313 as a deferred tax expense. This expense results from the company's use of accelerated depreciation in calculating its federal income-tax liability.

Pursuant to §441(a) of the Tax Reform Act of 1969, 26 U.S.C. 167 (1), regulated public utilities are entitled to the tax advantages associated with accelerated depreciation if the utility employs a normalization method of accounting.[10]

---

[10]This treatment applies only to property acquired after 1969. *See Narragansett Elec. Co.* v. *Harsch,* 117 R.I. 395, 411, 368 A.2d 1194, 1204 (1977).

Under normalization, taxes for ratemaking purposes are determined on the basis of straight-line depreciation. In determining its actual tax liability, however, the utility may enjoy the benefits of accelerated depreciation.

The difference between the taxes which would be paid under straight-line depreciation and the taxes that would be paid under accelerated depreciation is placed into a deferred tax reserve account by the taxpayer.[11] *See FPC* v. *Memphis Light, Gas & Water Division,* 411 U.S. 458, 460, 93 S. Ct. 1723, 1725, 36 L. Ed. 2d 426, 430 (1973); *Rhode Island Consumers' Council* v. *Smith,* 113 R.I. 384, 389-90, 322 A.2d 17, 20 (1974).

Here the Attorney General faults the resultant tax burden that current rate payers must shoulder in funding the deferred tax reserve. Because it does not reflect actual taxes paid, the fund is not considered a presently deductible cost-of-service expense. According to the Attorney General, this nondeductible status, combined with the company's 49.56 percent tax rate, forces current users to pay almost twice the amount in pretax revenues to produce the required reserve amount.

The Attorney General argues that this procedure works an injustice against current rate payers by forcing them to provide a fund which will benefit later rate payers. To that end the Attorney General argues that the commission should have adopted the division's proposal to have current rate payers pay only that amount actually needed for the reserve and leave the additional tax consequence to later rate payers.

The commission's principal reason for rejecting this proposal was its opinion that such an adjustment might jeopardize the company's ability to maintain the advantages of accelerated depreciation. Specifically, the commission

---

[11]The Federal Power Commission requires that this reserve be deducted from the rate base. Thus, rates charged to customers are lowered by the amount of the return on this reserve had it remained in the rate base. See *Memphis Light, Gas & Water Division* v. *Federal Power Commission,* 462 F.2d 853, 857 N.8 (D.C. Cir. 1972), *rev'd on other grounds,* 411 U.S. 458, 93 S. Ct. 1723, 36 L. Ed. 2d 426 (1973).

ruled that the adjustment would conflict with Internal Revenue Service (IRS) regulations governing the deferred tax reserve which must be maintained by a utility using normalization.

The basic issue before us, therefore, is whether the commission was correct in interpreting the IRS regulations as preventing the proposed adjustments. It is reasonable to assume that the IRS regulations do not contemplate a delaying of the tax consequences of creating the reserve fund. The regulations speak of maintaining a separate and distinct fund which is readily identifiable. *See Rhode Island Consumers' Council* v. *Smith*, 113 R.I. at 389-90, 322 A.2d at 20. It is conceivable that the IRS may not treat the division's proposed adjustment as cutting not only the tax consequences of creating the fund, but also the fund itself. In light of the possible risk that the company may lose the right to use accelerated depreciation, the commission's actions were entirely reasonable.

## Conclusion

In *"Valley Gas Company* v. *Edward F. Burke,"* No. 78-223 M.P., the petition for certiorari is denied and dismissed.

In *"Julius C. Michaelson et al.* v. *Valley Gas Company,"* No. 78-255 M.P., the records certified to this court are ordered returned to the commission with our decision endorsed thereon and with the directive that it recalculate the attrition allowance.

Mr. Justice Joslin did not participate.

*Edwards & Angell, Edward F. Hindle, Deming E. Sherman* (for Valley Gas Company); *Dennis J. Roberts II,* Attorney General, *John R. McDermott,* Special Assistant Attorney General (for Julius C. Michaelson et al.).

*Carl Freedman,* Rhode Island Legal Services, Inc. (for The Coalition for Consumer Justice).